*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KRIS DALE WINANS,

        Defendant-Appellant.

UNPUBLISHED
June 22, 2026
10:02 AM

No. 368357
Grand Traverse Circuit Court
LC No. 22-014277-FC

Before: MARIANI, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial conviction of torture, MCL 750.85, and his attendant sentence of 7 to 20 years' imprisonment. On appeal, he argues (1) that he was deprived of his constitutional right to due process; (2) that his trial counsel's performance was constitutionally ineffective and the trial court erred by denying him an evidentiary hearing on his claims to that effect; and (3) that in sentencing him, the trial court erroneously scored offense variable (OV) 7. We affirm.

## I. BACKGROUND

Defendant and the victim, after reconnecting over Facebook, began dating and went on a vacation to a rented cottage in Traverse City from September 18, 2022, to September 20, 2022. Although they apparently got into an argument on September 18—during which defendant told the victim they were not compatible—the victim testified at trial that things were going "[r]eally well" on September 19. After spending the day shopping, they ate dinner back at the cottage. The victim also drank alcohol and used a marijuana vape pen. And although she testified at the preliminary examination that she ate half of a hallucinogenic mushroom on September 19, she testified at trial that she actually ate the mushroom the day prior, September 18.[1] Regardless, the

---

[1] When refreshed with the transcript from the preliminary-examination hearing during cross-examination, the victim indicated that she did not remember stating that she ate the mushroom on

victim said she had a "buzz" but did not feel "fall[ ] over drunk or anything" on the evening of September 19. Defendant was also intoxicated that night.

From there, the victim's and defendant's narratives diverge. According to the victim, she tried to go to bed between 5:00 a.m. and 6:00 a.m.[2] But defendant did not want to go to bed and became aggressive. At that point, the two "popped off at the mouth" at each other before defendant hit the victim on the right side of her head. He then pulled the victim by her arms into the living room and put her on the couch. Each time she tried to get off the couch, defendant would physically assault her, kicking or punching her in the head. Defendant was verbally abusive as well. The victim testified that he called her a "[f]ucking whore, cunt, stupid ass bitch, [and] weak ass bitch" and said she would not be "so pretty . . . in the end." Defendant also "tried to make [her] bark like a dog," and told her that she "wasn't leaving there" and that "he would like nothing more than to see [her] dead." The victim further testified that defendant told her he had thrown her phone into the nearby lake. During the ordeal, the victim became worried she would never see her children or mother again.

Defendant then dragged the victim by her hair to another room and put her in there as if she were in a "time out." Each time she went to turn on the light, defendant would come in, "knock[ ] [her] across the bed," and turn the light off. At one point, while the two were arguing, the victim managed to get into the kitchen where she saw her phone on the counter; she grabbed it, called her ex-boyfriend, and pleaded for help before defendant snatched her phone. After the ex-boyfriend called the victim back, defendant answered the phone and told him he could not save the victim and, if he tried, he would "get wrapped up like a pretzel." While defendant was distracted by the ex-boyfriend's call, the victim made a break for the front door and grabbed two steak knives for protection as she fled. Ultimately, according to her preliminary-examination testimony, she left the knives on the counter before leaving the cottage.[3] Once outside, she saw one of the cottage's owners[4] and told the owner that she was not okay. The victim then called the police.

The prosecution called three additional witnesses at trial, starting with the cottage owner that spoke with the victim. She testified that, on September 20, 2022, her grandchildren came over to her house—which was next to the cottage—at around 8:30 a.m. She stated that she saw several

_____

the second day and "thought [she] took them the day [they] got there." Defendant testified that the victim consumed the mushroom on September 18 after they got to the cottage.

[2] At the preliminary examination, the victim testified that she went to bed at 5 a.m. At trial, however, she testified that she told defendant she wanted to go to bed at some point between 5:45 and 6 a.m.

[3] Though the victim repeated in her trial testimony that she grabbed the knives for protection as she made her escape, she did not expressly say that she brought them with her as she left the cottage.

[4] The cottage was owned by a married couple. Because the issues on appeal involve the wife significantly more than the husband, we will, for ease and simplicity, refer to the wife as "the cottage owner."

bags in the driveway and was worried there was an issue with the cottage. She then saw the victim carrying a white suitcase and crying; she also described the victim as upset. The victim told her that defendant had chased the victim around the cottage for the last three hours and that she was lucky she managed to escape. At that time, the victim's face was "kind of blotchy/red."

Grand Traverse Sheriff's Office Deputy George Preston testified that he reported directly to the scene after receiving a call at around 8:30 a.m. regarding an assault. When he spoke to the victim, she was "weeping" and had visible injuries. And even though she was not demonstrably intoxicated, Preston could smell intoxicants on her breath, which prompted him to administer a preliminary breath test that resulted in a blood alcohol content of 0.19. Preston also took photographs of the victim's injuries which were later admitted at trial. In describing one of those photos, Preston testified that

> [the victim's] left face and left area was swollen, she was going to end up with a
> black eye starting to turn that color. A hematoma or bump on and slight laceration
> on the left eyebrow. Her cheek was swollen, very red, and starting to turn purple.
> And, on the left side of her neck you could see marks or impressions where she had
> been assaulted.

He also described the other pictures, which depicted injuries to the victim's neck and face as well as dry blood on her nose and lip.

Lastly, the ex-boyfriend testified that, during the phone call which defendant intercepted, defendant told him that defendant would "push [him] up into a tiny little pretzel." He also stated that he heard the victim in the background say that defendant had hit her a couple of times. Ultimately, the ex-boyfriend drove three and a half hours to the cottage to take the victim home. He testified that, when he reached her, the victim was "[d]istraught," she was "crying and upset," and her face was bruised and her mouth was bleeding.

Defendant, testifying on his own behalf, painted a very different picture. According to him, he was the one who wanted to go to bed and it was the victim who then became agitated. When they laid down in bed together, defendant asked her to sleep in the other room; when she refused, the two got into "a wrestling match" and both ended up on the floor. From there, the victim went to the spare bedroom and fell down, hit her head on a dresser, and lost consciousness. Defendant tried to pick her up and place her on the bed in the spare room but could not do so because she kept slipping off the bed. After the victim woke up, she threw a shoe at defendant. He responded in kind and threw a shoe, which hit her in the nose. It was defendant's theory that the fall and the shoe caused the injuries to the victim's face.

Defendant further testified that he was not yelling, cussing, or threatening the victim during the altercation, nor did he ever try to keep her from leaving. He also averred that he never touched another person out of anger or hit a woman in his life. On cross-examination, however, he acknowledged that he had pleaded guilty to domestic violence against an ex-girlfriend in 2007. Defendant testified that, once the victim left the cottage, he packed his bags in his car and left.

Though the victim rejected the notion that her wounds were the result of a drunken fall, defense counsel cross-examined her extensively on her drug and alcohol use. The victim also

denied throwing a shoe at defendant. The victim further testified that after she got home from the cottage, she did not return to work for four days and ultimately quit her job. She described how the attack left her with two black eyes, bruising on the left side of her face and arms, and that the top plate to her dentures became embedded in her gums for a day and a half. The victim also stated that she started counseling after the assault, she now locks her doors at night, and she has started to practice shooting a gun.

The events from September 20, 2022, culminated in defendant's prosecution for a single count of torture. After a two-day trial, the jury convicted defendant as charged. As relevant here, the presentence investigation report (PSIR) scored OV 7 at 50 points because the victim "was subject to a tortuous, brutal assault, over an extended period" during which "defendant made statements leading her to believe she would die, and creating heightened fear and anxiety in the victim." Defendant did not object to the scoring of OV 7 at the sentencing hearing. Defendant was then sentenced as described above.

After defendant filed the instant appeal, he moved for a new trial, an evidentiary hearing, and the correction of his sentence before the trial court. Defendant first argued that the prosecution violated its duty to disclose evidence favorable to his defense under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), thereby depriving him of his constitutional right to due process. Next, he asserted multiple claims of ineffective assistance of trial counsel—namely, that counsel failed to interview crucial witnesses, to object to improper vouching testimony presented at trial, to properly impeach the victim, and to call an expert witness to testify about the effects of hallucinogenic mushrooms. Defendant also requested a *Ginther*[5] hearing to develop the factual bases for his ineffective-assistance claims. Finally, defendant posited that the trial court erred at sentencing because there was insufficient evidence to score OV 7. The trial court issued an 11-page order and opinion denying defendant's motion.

## II. ANALYSIS

Defendant's claims on appeal mirror those raised in his post-trial motion below.[6] We see no basis for relief in those claims.

## A. *BRADY* VIOLATION

Defendant first argues that a new trial is warranted because the prosecution committed a *Brady* violation by suppressing evidence favorable to his defense. According to defendant, the prosecution failed to disclose additional information that the cottage owner had divulged during

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[6] In addition to filing a brief on appeal, defendant filed a motion with this Court seeking remand for an evidentiary hearing on certain of the claims raised in his brief. A panel of this Court denied that motion, without prejudice, for "failure to persuade the Court of the necessity of a remand . . . ." *People v Winans*, unpublished order of the Court of Appeals, entered October 7, 2025 (Docket No. 368357). Upon plenary review of defendant's claims, we see continue to see no need for a remand to properly dispose of those claims on appeal.

an interview. Based on information obtained from a private investigator hired by defendant's appellate counsel, the cottage owner had informed the prosecution of a separate altercation that occurred outside of the cottage after the victim managed to escape. The cottage owner apparently told the prosecution that the victim blocked defendant's path from the cottage as he packed his belongings in his vehicle. Though the cottage owner told the victim to get out of defendant's way, the victim refused. The cottage owner described the victim as angry during this altercation and that she did not appear scared. Because this case was about credibility, defendant reasons, this information from the cottage owner "would have likely made a difference in the outcome of the case" since the other evidence in the case "was not overly strong."

The trial court rejected this argument for two reasons. First, it determined that the cottage owner's report of this encounter between defendant and the victim was not discoverable since it constituted protected work-product that was beyond the scope of the reciprocal criminal discovery rule, MCR 6.201(A)(2). Second, the trial court held that the statement from the cottage owner about this encounter lacked the materiality needed to fall within *Brady*'s ambit; that is, defendant failed to show a reasonable probability that the result at trial would have been different had this information from the cottage owner been disclosed, given the other evidence presented at trial.

## 1. STANDARD OF REVIEW

The trial court's decision whether to grant a new trial is reviewed for an abuse of discretion. *People v Brown*, 279 Mich App 116, 144; 755 NW2d 664 (2008) (citation omitted). "An abuse of discretion occurs when the court makes a decision that falls outside the range of reasonable and principled outcomes" or "makes an error of law." *People v Christian*, 510 Mich 52, 75; 987 NW2d 29 (2022) (quotation marks and citations omitted). We review the trial court's factual findings on a motion for a new trial for clear error, which "exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008) (quotation marks and citation omitted). "A trial court's decision on a *Brady* claim is reviewed de novo." *Christian*, 510 Mich at 75 (citation omitted).

## 2. DISCUSSION

"The Supreme Court of the United States held in *Brady* that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.' " *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014), quoting *Brady*, 373 US at 87. "To establish a *Brady* violation, a defendant must show that (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Acumby-Blair*, 335 Mich App 210, 217; 966 NW2d 437 (2020) (quotation marks and citation omitted). Evidence is "favorable . . . when it is either exculpatory or impeaching." *Id.* at 218 (quotation marks and citation omitted). With respect to the materiality element of a *Brady* claim, our Supreme Court has instructed that

> a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v Bagley*, 473 US 667, 682; 105 S Ct

-5-

3375; 87 L E2d 481 (1985). This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." [*Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995)]. The question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. *Id.* at 436. [*Chenault*, 495 Mich at 150-151.]

Furthermore, when evaluating materiality, courts must examine the suppressed evidence in relation to the evidence properly presented to the jury. *Christian*, 510 Mich at 77.

While we question the trial court's reliance on the reciprocal discovery rule in reviewing defendant's *Brady* claim, we agree with the court's ultimate conclusion that defendant has not shown entitlement to relief on that claim. Assuming, as defendant maintains, that the prosecution suppressed the statement from the cottage owner and that her statement constitutes favorable evidence, defendant has failed to show that the evidence was material under *Brady*. Although defendant cursorily asserts that the other evidence presented at trial "was not overly strong," he has made no meaningful argument as to how it is reasonably probable that the cottage owner's statement, had it been disclosed to the defense, would have affected the outcome of his trial.

Nor do we see grounds for such an argument in the record. There is no dispute that a physical altercation occurred at the cottage, during which defendant harmed the victim. Defendant only disagrees with the extent of the violence as described by the victim's testimony. And the evidence presented in support of the victim's narrative was extensive. The testimony from the cottage owner, Deputy Preston, and the ex-boyfriend all described the victim as visibly injured and distraught.[7] The jury also saw the photographs depicting the victim's injuries, and the ex-boyfriend's testimony regarding defendant's threats of physical harm toward him further corroborated defendant's belligerence during the altercation. And although defendant said he would never harm a woman, he was thoroughly impeached based on his previous domestic violence conviction. When considered in light of the evidence properly presented at trial, we fail to see a reasonable probability that, had the cottage owner's statement about certain post-assault events been disclosed to the defense, the outcome of defendant's trial would have been any different. See *Christian*, 510 Mich at 77; *Chenault*, 495 Mich at 150-151. Accordingly, defendant has not shown grounds for relief on this issue.

## B. INEFFECTIVE ASSISTANCE

We also find no grounds for relief in defendant's claims of ineffective assistance of counsel. "Generally, whether a defendant had the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266

---

[7] Although the cottage owner's statement to defendant's investigator suggests that the victim may have later exhibited anger towards defendant, that does not particularly contradict or vitiate her testimony regarding her initial observations of the victim.

(2012) (quotation marks and citation omitted). "This Court reviews findings of fact for clear error and questions of law de novo." *Id*.

"The United States and Michigan Constitutions protect a criminal defendant's right to a fair trial." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021), citing US Const, Am VI; Const 1963 art 1, § 17. "This includes the right to the effective assistance of counsel." *Id*. (citations omitted). "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016) (citations omitted). "Reasonable probability means a probability sufficient to undermine confidence in the outcome." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022) (quotation marks and citation omitted). This standard of prejudice is the same as that which is necessary to establish the materiality element of a *Brady* claim. *Chenault*, 495 Mich at 159.

This Court presumes counsel was effective, and a defendant carries a heavy burden to overcome that presumption. *People v Muniz*, 343 Mich App 437, 448; 997 NW2d 325 (2022). This burden includes "overcom[ing] the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). That said, "a court cannot insulate the review of counsel's performance by calling it trial strategy; counsel's strategy must be sound, and the decisions as to it objectively reasonable." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015) (quotation marks and citation omitted).

The defendant bears the burden of establishing the factual predicate of his claim of ineffective assistance. *People v White*, 331 Mich App 144, 148; 951 NW2d 106 (2020). Furthermore, "[f]ailure to raise a futile objection or advance a meritless argument does not constitute ineffective assistance of counsel." *Isrow*, 339 Mich App at 532.

### 1. FAILURE TO INVESTIGATE

Defendant first argues that trial counsel was ineffective for failing to meaningfully interview the cottage owner and her husband, and call them as witnesses at trial. The couple told defendant's private investigator that trial counsel came out to the cottage but never spoke with the cottage owner and only asked her husband about the location. Had counsel more thoroughly interviewed them, defendant maintains, he would have learned that the couple woke up at 6:30 a.m. on September 20, 2022, which would have been during the assault on the victim. Yet, the cottage owner did not hear anything from the cottage, which was only 10 feet from her house. She also told the investigator that when she saw the victim, the victim was not carrying any knives and was walking out of the cottage, not running. Additionally, as discussed, the cottage owner informed the investigator about the encounter between defendant and the victim that forms the basis of defendant's *Brady* claim.[8] According to defendant, counsel's failure to elicit and present this information deprived him of valuable impeachment evidence which tended to contradict the

---

[8] Though defendant's arguments on this point suggest that the husband also did not hear anything on the morning in question, defendant's offer of proof focuses on the cottage owner's observations (or lack thereof).

victim's narrative that there was loud yelling and that she needed to grab a knife for her protection, thereby prejudicing his chances of prevailing in the credibility contest presented at trial.

Even assuming trial counsel performed deficiently by not eliciting this information during his investigation and presenting it at trial, defendant has failed to demonstrate a reasonable probability that, had counsel done so, the outcome of his trial would have been different. *Shaw*, 315 Mich App at 672; see also *People v Anderson*, 322 Mich App 622, 631; 912 NW2d 607 (2018) (explaining that "the failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome" and "the failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense") (cleaned up); *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) ("A substantial defense is one that might have made a difference in the outcome of the trial.") (quotation marks and citation omitted).

As discussed, the prosecution presented overwhelming evidence that defendant assaulted the victim on the morning of September 20, 2022. Again, while there is a disagreement regarding the degree of violence, there is no dispute that defendant harmed the victim. The trial record included the victim's extensive testimony and photographs of her injuries, as well as testimony from the prosecution's witnesses which consistently described the victim as upset and crying, even hours after the assault ended. Defendant's credibility, meanwhile, was impeached through his prior domestic violence conviction, and the ex-boyfriend's testimony about his phone call with defendant only further substantiated defendant's belligerence on the morning in question. Just as with his *Brady* claim, defendant relies solely on the notion that the outcome of the trial would have been different had trial counsel more successfully impeached the victim, but he ignores not only the degree to which counsel did impeach the victim (discussed *infra*), but also the rest of the evidence presented at trial which independently supported the victim's version of events. In light of the entirety of the evidence presented at trial, defendant has failed to show a reasonable probability that trial counsel's failure to elicit and present additional information from the cottage owners made any difference in the outcome of the trial.

## 2. VOUCHING TESTIMONY

Defendant next claims that counsel performed ineffectively by failing to object to Preston's description of the victim's injuries at trial as the product of an "assault[ ]." According to defendant, such a comment constituted impermissible vouching testimony. "A witness may not comment on or vouch for the credibility of another witness," nor may a witness "opine about the defendant's guilt or innocence in a criminal case." *People v Lowrey*, 342 Mich App 99, 109; 993 NW2d 62 (2022) (quotation marks and citations omitted). Even so, a police officer may testify about his or her perceptions during an investigation. *Heft*, 299 Mich App at 82-83.

Reading his testimony in context, it is apparent that Preston did not purport to vouch for the victim's credibility. Preston did not describe what the victim told him or what she reported to the police, nor did he testify that he believed the victim's allegations. Instead, Preston testified about what he perceived in a picture that depicted the victim's injuries and was ultimately admitted into evidence. Preston was permitted to testify about his own perceptions during his investigation, *id.*, and we fail to see how his passing use of the term "assault" in his testimony here amounted to impermissible vouching—particularly given that defendant, as discussed, admitted to committing

at least some degree of violence against the victim. Thus, any objection on the basis of Preston's comment would have been meritless and cannot support a viable claim of ineffective assistance. *Isrow*, 339 Mich App at 532.

### 3. FAILURE TO IMPEACH

Defendant next claims counsel was ineffective because he failed to cross-examine the victim more effectively on a number of supposed inconsistencies between statements the victim made in the police report, during the preliminary examination, and at trial. Defendant, however, has failed to show that his trial counsel's cross-examination of the victim was unsound or objectively unreasonable. The record indicates that trial counsel cross-examined the victim extensively regarding her consumption of alcohol, marijuana, and a hallucinogenic mushroom before the violence began. Counsel also impeached the victim with an inconsistency between her preliminary-examination testimony and her trial testimony regarding the precise date that she ate that mushroom. These questions evince trial counsel's attempts to impeach the victim's credibility regarding her memory of the events of the morning in question.

Although defendant acknowledges his trial counsel's impeachment of the victim's credibility regarding her intoxication, he maintains that counsel's performance was deficient because he did not impeach the victim further regarding the details of the assault. This argument elides the connection between the victim's intoxication and defendant's narrative of events. It was defendant's testimony that the victim's injuries were the result of a drunken fall and the shoe that defendant threw at her face. Correspondingly, trial counsel's impeachment of the victim focused on supporting defendant's assertion that the victim's injuries were partially the product of her intoxication. And since only defendant and the victim testified about how the victim's injuries were caused, counsel's strategy does not appear to be objectively unreasonable. That this strategy may not have worked does not render counsel's representation constitutionally deficient. *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004). Defendant has failed to show that counsel performed ineffectively on this basis.

### 4. EXPERT TESTIMONY

Lastly, defendant claims his trial counsel was ineffective because he failed to present expert witness testimony regarding the effects of hallucinogenic mushrooms. To assert that defense counsel was ineffective for failing to call an expert witness, a defendant must offer proof that the expert witness would have testified favorably if called by the defense. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). Yet at no point, below or on appeal, has defendant presented any such offer of proof.[9] Accordingly, defendant has not established the factual predicate for this claim. *Id.*; *White*, 331 Mich App at 148.

---

[9] All defendant has done is provide a link to a website with information regarding hallucinogenic mushrooms; he has not identified an expert nor offered anything to demonstrate how that expert would testify—such as whether or to what extent the testimony would align with the information presented on the offered website, let alone how the expert might testify with respect to the facts of this case in particular.

Furthermore, and relatedly, defendant has failed to show how trial counsel's purported failure in this respect may have made a difference in the outcome of his trial. Both below and on appeal, defendant argues that expert testimony regarding the effects of hallucinogens on one's perception and memory would have undermined the victim's credibility and reliability. But the jury was presented with information regarding the victim's alcohol consumption and level of intoxication during the events in question, and the negative effects of alcohol, including the impact of alcohol on a person's memory or perception, are "common knowledge" that do not require expert testimony to explain. See *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 790; 685 NW2d 391 (2004). The jury therefore would have already understood that the victim's memory or perception may have been impaired, and defendant has offered nothing to show how expert testimony regarding the mind-altering effects of hallucinogenic mushrooms would have meaningfully added to the jury's assessment of the victim's reliability in that regard, such that there is a reasonable probability its absence affected the outcome of the trial. Defendant has failed to demonstrate ineffective assistance of counsel on this basis, either.[10]

## C. OV 7

As his final claim of error on appeal, defendant contends that he must be resentenced because the trial court erred by assessing 50 points for OV 7. "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Ziegler*, 343 Mich App 406, 410; 997 NW2d 493 (2022) (cleaned up); *Miller*, 482 Mich at 544. "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Lydic*, 335 Mich App 486, 490; 967 NW2d 847 (2021) (quotation marks and citation omitted).

OV 7 is scored at 50 points in cases involving "aggravated physical abuse" where a "victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). As the *Lydic* Court instructed, 335 Mich App at 496-497:

> If the case involves conduct consisting of one or more of the categories of sadism, torture, or excessive brutality, then OV 7 applies. If the case does not . . . then the sentencing court must determine whether the case involves "similarly egregious conduct" to at least one of those categories. If it does, the court also must determine

---

[10] Defendant also challenges the trial court's decision to deny his request for a *Ginther* hearing. We see, however, no abuse of discretion in that decision. *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008). Nor, for that matter, do we see any reason to revisit this Court's prior assessment, noted above, that a remand for such a hearing is not necessary to properly dispose of defendant's claims on appeal. For the reasons discussed, defendant, both below and on appeal, has failed to advance colorable claims that his counsel performed ineffectively, and has also failed to adequately "set forth any additional facts that would require development of a record to determine if defense counsel was ineffective[.]" *People v Williams*, 275 Mich App 194, 200; 737 NW2d 797 (2007).

-10-

whether the conduct substantially increased a victim's fear and anxiety. If all those factors are met, then OV 7 applies . . . ."

For OV 7 to be scored under the fourth category, the defendant must have engaged in conduct that was "beyond the minimum required to commit the offense" and "was intended to make a victim's fear or anxiety greater by a considerable amount." *Id*. at 497 n 7 (cleaned up). "Although all crimes against a person involve the infliction of a certain amount of fear and anxiety, the trial court may consider conduct inherent in a crime when scoring OV 7." *People v Alexander*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 364063); slip op at 14 (quotation marks and citation omitted).

Defendant was convicted of torture, which "requires proof beyond a reasonable doubt that (1) defendant intended to cause cruel or extreme physical or mental pain and suffering, (2) defendant inflicted great bodily injury, and (3) the complainant was within defendant's custody and control." *Id.* at ___; slip op at 14, citing MCL 750.85. Defendant contends that his "behavior was simply not depraved or extreme enough to warrant imposition of OV 7's draconian 50-point score" because the emotional stress and physical injuries he inflicted on the victim did not exceed the "bare minimum elements of torture." The record, however, belies this claim.

As discussed, the record showed that defendant expressly stated that "he would like nothing more than to see [the victim] dead," thereby implicating the gratifying nature of his violence. Defendant demeaned her by referring to her as a "whore," "cunt," and "stupid ass bitch" while striking her in the head and face. Defendant demanded her to "bark like a dog" and later dragged her around the cottage by her hair. He also confined her to a locked room for a significant length of time. Additionally, he told the victim that she was not "getting out this house" and that "[n]obody is coming to save you," and lied to the victim that he had thrown her phone into the nearby lake. The victim testified that she questioned whether she would see her children or her mother again. Furthermore, the victim testified that the physical injuries she suffered left her in severe pain for days after she returned home, and that the ordeal resulted in her quitting her job and taking shooting lessons to feel more secure.

Taken together, this evidence demonstrates that the victim was treated with "sadism," which OV 7 defines as "conduct that subjects a victim to extreme or prolonged pain or humiliation and is inflicted to produce suffering or for the offender's gratification." MCL 777.37(3). And even if defendant's conduct fell short of that definition, that conduct—which included overt death threats and demeaning, abusive taunts—was at least "similarly egregious" to it and went beyond the minimum required by his conviction. See *Lydic*, 335 Mich App at 499 (finding similar death threats and taunts to be, at minimum, " 'similarly egregious' to sadism based on their infliction of humiliation and other emotional suffering"); see also *Alexander*, ___ Mich App at ___; slip op at 14 (referring to the "yelling [at] or taunting" of a victim of torture as "similarly egregious conduct" sufficient to warrant an assessment of 50 points under OV 7). It is also apparent that defendant's death threats and abusive taunts were intended to—and did—greatly augment the victim's fear and anxiety. As discussed, defendant intentionally led the victim to believe that she was isolated, had no way to escape or reach others for help, and may be killed then and there by defendant. Moreover, the victim testified that this caused her to fear not only for her own life, but for the well-being of her kids and her mother, for whom the victim was the primary caregiver. Cf. *Lydic*, 335 Mich App at 499. Accordingly, we see no reversible error in the trial court's scoring of OV 7.

Affirmed.

/s/ Philip P. Mariani
/s/ Christopher M. Murray
/s/ Sima G. Patel